Walter TATERA deceased and
Vicki Tatera individually and as
Special Administrator of the
Estate of Walter Tatera,
Plaintiffs-Appellants,

v.

FMC CORPORATION,
Defendant-Respondent-Petitioner,

UNITED HEALTHCARE and
American Medical Security,
Subrogated Defendants,

KELSEY-HAYES COMPANY
p/k/a K H Corporation,
Defendant.

Supreme Court

*No. 2008AP170. Oral argument March 3, 2010.
—Decided July 20, 2010.*

2010 WI 90

(Also reported in 786 N.W.2d 810.)

For the defendant-respondent-petitioner there were briefs by *Mark S. Des Rochers* and *Mark Des Rochers*, Attorney at Law, LLC, Appleton, and oral argument by *Mark S. Des Rochers*.

For the plaintiffs-appellants there was a brief by *Jill A. Rakauski*, *Steven R. Penn*, and *Penn Rakauski*, Racine, and oral argument by *Jill A. Rakauski*.

An amicus curiae brief was filed by *James A. Friedman*, *Josh Johanningmeier*, *Bryan J. Cahill*, and *Godfrey & Kahn*, *S.C.*, Madison, on behalf of the Wisconsin Insurance Alliance, and oral argument by *Bryan J. Cahill*.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published decision of the court of appeals[1] that affirmed in part and reversed in part an order of the Milwaukee County Circuit Court, Judge Timothy G. Dugan presiding, which granted summary judgment to FMC Corporation (FMC) on the negligence and strict liability claims brought by Vicki Tatera and the Estate of Walter Tatera, her late husband (collectively Tatera).

---

[1] *Tatera v. FMC Corp.*, 2009 WI App 80, 319 Wis. 2d 688, 768 N.W.2d 198.

Tatera seeks to hold FMC liable for Walter Tatera's[2] death from malignant mesothelioma, a cancerous disease which allegedly resulted from his work machining asbestos-containing products supplied by FMC. The court of appeals agreed that FMC was entitled to summary judgment on Tatera's strict liability claim but reversed and remanded on the negligence claim, holding that Tatera presented a prima facie case of negligence under Restatement (Second) of Torts § 388 (1965) and that *Wagner v. Continental Casualty Co.,* 143 Wis. 2d 379, 421 N.W.2d 835 (1988), did not bar the claim against FMC. FMC petitioned this court for review,[3] and we accepted. We now reverse the decision of the court of appeals.

¶ 2.    As a general rule, a principal employer[4] is not liable in tort for injuries sustained by an independent contractor's employee while he or she is performing the contracted work. *Wagner,* 143 Wis. 2d at 400–01. There

---

[2] For clarity, we will hereinafter refer to Walter Tatera by his first name when we are referring to him individually.

[3] Tatera withdrew her cross petition for review of the court of appeals' decision to affirm the order granting FMC summary judgment on the strict liability claim. Accordingly, only the negligence claim is at issue before this court.

[4] The person or entity that hires an independent contractor is variously referred to as the "principal employer," the "general contractor," or the "owner." *See, e.g., Wagner v. Cont'l Cas. Co.,* 143 Wis. 2d 379, 382, 421 N.W.2d 835 (1988) (using "principal employer" and "general contractor" interchangeably); *Snider v. N. States Power Co.,* 81 Wis. 2d 224, 228, 260 N.W.2d 260 (1977) (using "owner"); *Estate of Thompson v. Jump River Electric Coop.,* 225 Wis. 2d 588, 590 & n.1., 593 N.W.2d 901 (Ct. App. 1999) (using "principal employer" and "owner" interchangeably). To remain consistent, we will use the term "principal employer."

are, however, two exceptions to that general rule. If either exception is met, the principal employer may be liable. Consequently, accepting Tatera's allegations as true, we must analyze the two exceptions. Pursuant to the first exception, we must determine whether the principal employer, here, FMC, committed an affirmative act of negligence by negligently (1) failing to warn Walter and his employer of the health hazards associated with asbestos; (2) failing to warn them of the danger and harm of asbestos after the products were supplied; (3) failing to investigate or test for the health effects of asbestos prior to supplying the products; (4) failing to instruct Walter and his employer in the use of precautionary measures relating to asbestos-containing products; or (5) supplying unsafe asbestos-containing products. Pursuant to the second exception, we must determine whether the activity of machining an asbestos-containing friction disk is extrahazardous. If we conclude that either exception applies, Tatera has here presented sufficient facts to state a claim for negligence.

¶ 3. We conclude that Tatera's negligence claim against FMC falls within the general rule that a principal employer is not liable in tort for injuries sustained by an independent contractor's employee while he or she is performing the contracted work. In this case, neither of the two exceptions to that general rule applies. First, even accepting Tatera's allegations as true, we conclude that FMC's conduct did not constitute an affirmative act of negligence. Rather, Tatera's allegations of negligence are grounded in FMC's alleged omissions. By definition, the negligent failure to warn, failure to investigate or test, and failure to instruct are omissions, not affirmative acts of negligence. Moreover, the act of supplying asbestos-containing friction disks

327

does not itself constitute an affirmative act of negligence because liability for such an act is necessarily premised in failing to warn, an omission. Second, we conclude that machining an asbestos-containing friction disk does not qualify as an extrahazardous activity because steps may be taken to minimize the risk of injury. Because we hold as a matter of law that FMC is not liable in tort to Tatera, Tatera's negligence claim under Restatement (Second) of Torts § 388 is necessarily barred.

## I. FACTUAL BACKGROUND
## AND PROCEDURAL POSTURE

¶ 4. Walter Tatera died from malignant mesothelioma on September 20, 2004. Mesothelioma is a rare form of cancer in which malignant cells develop in the mesothelium, a membrane that covers and protects most of the body's internal organs. *State v. Harenda Enters., Inc.*, 2008 WI 16, ¶ 79, 307 Wis. 2d 604, 746 N.W.2d 25 (Ziegler, J., dissenting) (citing National Cancer Institute, Mesothelioma: Questions and Answers 1 (2002), http://www.cancer.gov/images/Documents/67e63bef-d6e0–4c0f-9c7a-e8aa56ed969c/Fs6_36.pdf). "Most people who develop mesothelioma have worked on jobs where they inhaled asbestos particles." *Harenda*, 307 Wis. 2d 604, ¶ 79 (Ziegler, J., dissenting) (internal quotations omitted). From fall 1968 through 1993, Walter was employed full-time by B&M Machine Products (B&M), a machining shop owned by his father and located in Hales Corners, Wisconsin.[5]

¶ 5. In 1967, FMC purchased Stearns Electric Company (Stearns), a Milwaukee-based manufacturer of industrial electric brakes that occasionally out-

---

[5] Walter also worked at B&M periodically in 1963, 1964, and 1967.

■■■■■■■■■■■■■■

sourced some of its machining work to B&M.[6] Stearns' brake systems were comprised of several component parts, many of which were metal. One of the few non-metal component parts was a friction disk,[7] which up until 1986 contained some form of asbestos.[8] Asbestos-containing friction disks were among the component parts that Stearns supplied to B&M. Walter and other B&M employees machined[9] the asbestos-containing friction disks to achieve a desired size and shape. The friction disks were then returned to Stearns for incorporation into the finished brake systems. It is undisputed that every asbestos-containing friction disk supplied to B&M from Stearns was not manufactured by Stearns. Instead, Stearns purchased the friction disks from several different manufacturers.

[6] For purposes of this case, our various references to FMC and Stearns are interchangeable.

[7] In the record, the term "friction disk" is used interchangeably with "friction lining" and "friction brake lining," all referring to the same component part. For consistency, we will use the term "friction disk."

[8] "Asbestos is the name given to a number of naturally occurring fibrous minerals with high tensile strength, the ability to be woven, and resistance to heat and most chemicals." United States Environmental Protection Agency (EPA), Asbestos: Basic Information, http://www.epa.gov/asbestos/pubs/help. html (last visited July 2, 2010). Because of their valuable properties, asbestos fibers have been widely used in manufactured goods, including roofing shingles, tiles, paper and cement products, plastics, textiles, coatings, and friction products such as automobile clutch and brake parts. *Id.*; National Cancer Institute, Asbestos Exposure and Cancer Risk 2 (2009), http:// www.cancer.gov/images/documents/5ac7d2fc-27df-4ecc-839f-dc5bc1909e01/FS3_21.pdf.

[9] The verb "machine" is defined as "[t]o cut, shape, or finish by machine." *The American Heritage Dictionary of the English Language* 1076 (3d ed. 1992).

¶ 6. According to Richard Hotchkiss (Hotchkiss), who was employed by B&M from 1954 until July 1972, Stearns did not instruct B&M on how to machine the friction disks; instead, Stearns provided B&M with a drawing illustrating only the desired result:

> Q [Attorney DesRochers, counsel for FMC]: . . . Before you needed to machine something, you needed to know how to do it; right?
>
> A [Hotchkiss]: Yeah.
>
> Q: Okay. And is it your recollection that there would have been a drawing that showed you how to machine these spacers[10] the very first time that you did it?
>
> A: No.
>
> Q: Okay.
>
> A: There would be a drawing there to show you what it looked like and what the sizes were, and you made it that way.
>
> Q: Okay. There was a drawing that you followed for purposes of machining these spacers; is that right?
>
> A: Yeah. It didn't tell you how to make it, though.

---

[10] Hotchkiss equated "spacers" with the friction brake linings (or for our purposes, friction disks) supplied to B&M by Stearns:

> Q: The spacer work, was that what you're calling brake— brake—lining work?
>
> A: That was brake lining, too, material.
>
> . . . .
>
> Q: Machining these what you referred to as spacers, is that what you have a recollection of seeing [Walter] Tatera do?
>
> A: Yeah.

Q: Okay.

A: You could do it anyway you wanted, as long as it turned out like the picture on the—on the drawing.

. . . .

Q: Ste[a]rns [] did not tell you how to machine these spacers?

A: No.

Q: They just had a drawing in there that some draftsman had done to show dimensions?

A: Right.

¶ 7.   At the time, Hotchkiss was unaware that the friction disks contained asbestos: "I didn't know if they had asbestos in them. At the time, there was no big thing about asbestos." However, he acknowledged the dust caused by the machining and testified that Walter's father installed a vacuum system to collect the dust in the shop. Hotchkiss wore a surgical mask only "[o]nce in a while" and did not train Walter to wear a mask while machining the friction disks:

Q: . . . And when you trained [Walter] Tatera how to machine brake linings, did you wear a mask?

A: No.

Q: Did you instruct him to wear a mask?

A: No.

Nevertheless, Hotchkiss reported that Walter wore a surgical mask while machining: "Well, I had a hard time breathing when I wore that mask, so I didn't wear it, probably not as often as I—but [Walter] did wear it."

¶ 8.    Walter died from malignant mesothelioma on September 20, 2004. According to his death certificate, he had been diagnosed with the disease three months earlier.

¶ 9.    On September 17, 2004, Tatera filed a complaint against FMC and several other defendants,[11] alleging negligence and strict products liability.[12] As to the negligence claim, Tatera alleged that FMC had a duty to exercise reasonable care for the safety of Walter and those who worked with or were exposed to FMC's asbestos-containing products and that FMC knew or should have known that exposure to those products caused disease or death. In particular, Tatera claimed that FMC was negligent by committing "the following acts or omissions" that allegedly caused Walter's injuries:

a.  Failed to adequately warn [Walter] or others of the health hazards of asbestos;

b.  Failed to warn [Walter] or others of the danger and harm of the asbestos after the products or equipment were installed at the premises;

c.  Failed to investigate or test for the health effects of asbestos prior to distribution and sale;

d.  Failed to instruct [Walter], his employers or others in the use of precautionary measures relating to asbestos-containing products and/or

---

[11] Of those defendants, only FMC and Kelsey-Hayes Company remain. Kelsey-Hayes Company is not a party to this appeal.

[12] Following Walter's death, Tatera amended her complaint to include a wrongful death claim. She subsequently amended her complaint two more times, the most recent of which occurred on October 2, 2006. Her negligence claim against FMC remained unchanged throughout.

e. Manufactured, supplied, installed, or removed unsafe asbestos-containing products.

¶ 10.  In its answer, FMC denied the allegations and asserted that it otherwise had no duty to Walter and was immune from Tatera's claims. On that basis, FMC moved for summary judgment on May 12, 2006, citing the general rule under *Wagner* that a principal employer (in this case, FMC on Stearns' behalf) is afforded immunity from tort claims asserted by employees of the principal's independent contractor (here, B&M). FMC argued that neither of the narrow exceptions applied: namely, Tatera alleged no affirmative acts of negligence on the part of FMC, and Walter's work of machining asbestos-containing friction disks was not extrahazardous.

¶ 11.  In response, Tatera maintained that Restatement (Second) of Torts § 388,[13] adopted by this court in *Strasser v. Transtech Mobile Fleet Service, Inc.*, 2000 WI 87, 236 Wis. 2d 435, 613 N.W.2d 142, provides her with a method of recovery in tort. Tatera further argued

---

[13] Restatement (Second) of Torts § 388 (1965), "Chattel Known to be Dangerous for Intended Use," provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

that *Wagner* does not bar her negligence claim against FMC because her complaint alleged that FMC committed an affirmative act of negligence by "[m]anufactur[ing], suppl[ying], install[ing], or remov[ing] unsafe asbestos-containing products." In the alternative, Tatera argued that *Wagner* is inapplicable "because working with asbestos-containing products is an abnormally dangerous activity."

¶ 12. Initially, on September 6, 2006, Judge Clare L. Fiorenza denied FMC's motion for summary judgment. However, on August 1, 2007, due to judicial rotation, Judge Timothy G. Dugan replaced Judge Fiorenza as the presiding judge in this case. FMC subsequently renewed its motion, and Judge Dugan agreed to hear it over Tatera's objection. On November 27, 2007, Judge Dugan granted FMC's motion for summary judgment. The circuit court first determined that the duty to warn under Restatement (Second) of Torts § 388 is inapplicable in this case, reasoning that § 388 applies only to manufacturers, and FMC did not manufacture the asbestos-containing friction disks. Second, the circuit court agreed with FMC that *Wagner* barred Tatera's negligence claim. According to the circuit court, Tatera alleged FMC's failure to warn, which does not constitute an affirmative act of negligence. In addition, relying on the Seventh Circuit Court of Appeals decision in *Anderson v. Marathon Petroleum Co.*, 801 F.2d 936 (7th Cir. 1986), the court concluded that the activity of working with asbestos "is inherently dangerous and not extrahazardous." Accordingly, the circuit court determined that neither of the exceptions to *Wagner* applied.

¶ 13. On May 12, 2009, the court of appeals reversed the circuit court's order granting summary judgment to FMC on the negligence claim. *Tatera v. FMC*

*Corp.*, 2009 WI App 80, ¶ 32, 319 Wis. 2d 688, 768 N.W.2d 198. The court of appeals concluded that the circuit court erred in determining that Restatement (Second) of Torts § 388 is inapplicable to suppliers like FMC: "Nothing in Restatement (Second) of Torts § 388 itself or Wisconsin case law limits the applicability of the rule *only* to those who manufacture the property." *Id.*, ¶ 37. According to the court of appeals, Tatera put forth sufficient proof to allow the § 388 claim to go forward, *see id.*, ¶¶ 41–44, and in the least, genuine issues of material fact precluded summary judgment in FMC's favor, including whether FMC warned B&M that the friction disks contained asbestos and that asbestos was dangerous, *id.*, ¶ 47. Finally, assuming without deciding that B&M was an independent contractor, the court of appeals held that *Wagner*'s general rule of immunity did not bar Tatera's negligence claim against FMC because the two exceptions applied. *Id.*, ¶ 49. First, the court concluded that FMC committed an affirmative act of negligence by supplying the asbestos-containing friction disks to B&M. *Id.*, ¶ 51. Second, the court determined that the "ultra-hazardous material exception applie[d]" because asbestos is recognized as a dangerous material. *Id.*, ¶¶ 52–53 (citing *Wausau Tile, Inc. v. Cnty. Concrete Corp.*, 226 Wis. 2d 235, 261, 593 N.W.2d 445 (1999)).

¶ 14.  FMC petitioned this court for review, and we accepted on November 3, 2009. We now reverse the decision of the court of appeals.

## II. STANDARD OF REVIEW

¶ 15.  Whether the circuit court properly granted summary judgment to FMC is a question of law that we review independently, applying the same standards

used by the circuit court. *See Racine Cnty. v. Oracular Milwaukee, Inc.*, 2010 WI 25, ¶ 24, 323 Wis. 2d 682, 781 N.W.2d 88. Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2) (2007–08).[14] In this case, we are concerned with the scope of a principal employer's duty to an independent contractor's employee, which presents an issue of law that we evaluate de novo. *Wagner,* 143 Wis. 2d at 384–85. A principal employer is liable in tort for injuries sustained by an independent contractor's employee in only two circumstances: if the principal employer committed an affirmative act of negligence, *id.* at 388, or if the employee was injured while engaged in an extrahazardous activity, *id.* at 401. Both present questions of law. *See id.* at 402; *Snider v. N. States Power Co.,* 81 Wis. 2d 224, 233, 260 N.W.2d 260 (1977); *Danks v. Stock Bldg. Supply, Inc.,* 2007 WI App 8, ¶ 16, 298 Wis. 2d 348, 727 N.W.2d 846.

## III. ANALYSIS

¶ 16.   In *Wagner,* this court joined the majority of other jurisdictions in holding that a principal employer is generally not liable in tort for injuries sustained by an independent contractor's employee while he or she is performing the contracted work. 143 Wis. 2d at 400–01. We were persuaded that "[a]ny other holding would circumvent the bedrock principles of Wisconsin worker's

---

[14] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

compensation law." *Id.* at 401. An injured employee's right to recover worker's compensation benefits "shall be" the employee's "exclusive remedy" against his or her employer. Wis. Stat. § 102.03(2). We recognize that for purposes of § 102.03(2), a principal employer is not considered the direct "employer" of an independent contractor's employee, and pursuant to Wis. Stat. § 102.29(1), the injured employee is entitled to bring a tort action against "any other party." *See Wagner,* 143 Wis. 2d at 385; *Estate of Thompson v. Jump River Electric Coop.,* 225 Wis. 2d 588, 593, 593 N.W.2d 901 (Ct. App. 1999). Nevertheless, we concluded in *Wagner* that a principal employer should be generally protected from such tort liability because it has already assumed financial responsibility for injuries to the independent contractor's employees. 143 Wis. 2d at 399–400. That is, the contract price between the principal employer and the independent contractor is presumed to include payment for worker's compensation coverage; thus, "[t]he employee has a remedy for the injury—worker's compensation—for which the principal employer has indirectly paid." *Id.* at 399.[15] It is important to recognize that the injured employee is not without a claim; rather, his or her claim sounds in worker's compensation, not tort. In *Wagner,* we favorably cited the Seventh Circuit Court of Appeals decision in *Anderson,* in which the court similarly held that a principal employer is not

---

[15] Here, the record is void as to whether Walter sought or received worker's compensation benefits from his employer, B&M. Pursuant to Wis. Stat. § 102.06, if an injured employee's direct employer fails to carry worker's compensation, the principal employer may be liable for paying worker's compensation to the employee. Tatera has not raised § 102.06 as a method of recovery against FMC, and we therefore assume that Tatera had the opportunity to seek worker's compensation from B&M.

337

liable for injuries sustained by an independent contractor's employee because the injured employee is compensated for the risks of employment by a combination of wages, benefits, and entitlement to worker's compensation, a compensation package for which the principal employer paid in the contract price. *Id.* at 400 (citing *Anderson*, 801 F.2d at 941). "Since the principal is the indirect employer of its contractor's employees, to make the principal liable in common law tort for the accidents befalling those employees would be inconsistent with the bedrock principle that workers' compensation rights are exclusive of common law tort rights." *Anderson*, 801 F.2d at 941. Today, we reaffirm that policy consideration first adopted in *Wagner*.

¶ 17. Moreover, imposing liability on a principal employer for injuries sustained by an independent contractor's employee runs counter to the notion that the principal employer has relinquished control to the independent contractor. *See Kerl v. Dennis Rasmussen, Inc.*, 2004 WI 86, ¶ 24, 273 Wis. 2d 106, 682 N.W.2d 328. Therefore, the independent contractor, not the principal employer, is in the best position to guard against injuries to employees while performing the contracted work. *See id.*, ¶ 27 ("If a principal does not control or have the right to control the day-to-day physical conduct of the agent, then the opportunity and incentive to promote safety and the exercise of due care are not present, and imposing liability without fault becomes difficult to justify on fairness grounds.").

¶ 18. At the same time, our case law recognizes two exceptions to the general rule that a principal employer is not liable in tort for injuries sustained by an independent contractor's employee while he or she is performing the contracted work. The first exception was recognized over three decades ago in *Barth v.*

338

*Downey Co.,* 71 Wis. 2d 775, 783, 239 N.W.2d 92 (1976), and pertains to an affirmative act of negligence committed by the principal employer. That is, an independent contractor's employee may recover for injuries caused by a principal employer's affirmative act of negligence. *Wagner,* 143 Wis. 2d at 388 (citing *Barth,* 71 Wis. 2d at 783); *see also Danks,* 298 Wis. 2d 348, ¶ 17. The second exception was articulated over two decades ago in *Wagner* and imposes liability on a principal employer for contracted work that qualifies as extrahazardous. 143 Wis. 2d at 401. Accordingly, a principal employer may be liable for injuries sustained by an independent contractor's employee while he or she is engaged in an extrahazardous activity. *Id.*; *see also Estate of Thompson,* 225 Wis. 2d at 595–96.

¶ 19.    Tatera argues that we need not reach these two exceptions because in this case, the general non-liability rule protecting principal employers does not apply in the first instance. This is so, she asserts, because the relationship between FMC and B&M is not one of principal employer and independent contractor but instead one of bailor and bailee.[16] We reject Tatera's

---

[16] "Bailment" in the legal sense "signifies a contract resulting from delivery of a thing by the bailor to the bailee on condition that it be restored to the bailor in accordance with his or her directions as soon as the purpose for which it was bailed is satisfied." 8 C.J.S. *Bailments* § 1 (2005). Traditional bailment transactions consist of the delivery of goods that are returned to the bailor in the same form in which they were delivered. *Collins v. Click Camera & Video, Inc.,* 621 N.E.2d 1294, 1296 (Ohio Ct. App. 1993); *see, e.g., Henricksen v. McCarroll,* 45 Wis. 2d 368, 373, 173 N.W.2d 153 (1970) (recognizing the parties' relationship as one of bailment when the bailor delivered his horse to the bailee for purposes of transporting it to and

argument and conclude that B&M is properly charac-
terized as an independent contractor.

from Indianapolis for a parade). However, given the increasing
complexity of commercial relationships, bailment law has ex-
panded to include many new and varied transactions, including
the "bailment of incomplete goods for the purpose of having the
bailee manufacture, repair, or otherwise improve them." *Collins,*
621 N.E.2d at 1296; 8 C.J.S. *Bailments* § 4. It is this latter
transaction to which Tatera evidently refers when characterizing
FMC's relationship with B&M as one of bailment.

We note that Tatera did not advance her bailment argument
in the circuit court or court of appeals nor did she raise the issue
in her response to FMC's petition for review. To the contrary, up
until she filed her brief to this court, Tatera appeared to concede
that FMC and B&M's relationship was one of principal employer
and independent contractor. In FMC's brief in support of its
motion for summary judgment, FMC stated that "plaintiff has
not disputed FMC's assertion that Mr. Tatera's employer, B&M
Machine, was the independent contractor and that Stearns was
its principal." In her brief in response, Tatera did not quarrel
with that statement. Arguments raised for the first time on
appeal are generally deemed forfeited. *See Marotz v. Hallman,*
2007 WI 89, ¶ 16, 302 Wis. 2d 428, 734 N.W.2d 411. Further-
more, "unless ordered otherwise by the supreme court," a peti-
tioning party is precluded from raising or arguing an issue not set
forth in the petition. Wis. Stat. (Rule) § 809.62(6).

Moreover, assuming without deciding that the contract to
machine friction disks was indeed a bailment transaction,
Tatera points to no authority for her apparent belief that a
relationship of bailor and bailee and a relationship of principal
employer and independent contractor are mutually exclusive.
*Contra Rose v. Miller & Co.,* 432 So. 2d 1237, 1239 (Ala. 1983)
(recognizing the general rule that the owner of a chattel who
surrenders entire control thereof to an "independent contractor
or bailee" is not liable for injuries to an employee of that
independent contractor). The fact that independent contractor
cases often involve a contract for construction, as opposed to the
machining of goods, does not mean that a contract for construc-
tion is a prerequisite to the classification of independent con-

¶ 20. An independent contractor is a person or entity that contracts to perform services for another but " 'is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.' " *Kerl,* 273 Wis. 2d 106, ¶ 24 (quoting Restatement (Second) of Agency, § 2(3) (1958)); *see also* Wis JI—Civil 4060. Whether the parties used the term "independent contractor" in their contract is not dispositive; rather, "the test looks beyond labels to factual indicia of control or right to control." *Kerl,* 273 Wis. 2d 106, ¶ 24; *see also Snider,* 81 Wis. 2d at 232 ("The most important single criterion in determining whether a person is an independent contractor is the degree to which the owner, rather than the independent contractor, retains the right to control the details of the work."). In this case, B&M is properly characterized as an independent contractor. B&M contracted to machine friction disks for Stearns, but B&M retained control with respect to performing the machining. The machining was conducted at B&M's shop, and according to Hotchkiss, a B&M employee, Stearns did not instruct the B&M employees how to machine the friction disks. So long as the friction disks "turned out like the picture," B&M was free to machine them in the manner it chose. *See Snider,* 81 Wis. 2d at 232 (concluding that the plaintiff's employer was "indisputably an independent contractor" because the principal employer made no attempt to control the details of the contracted work and was concerned only that "the completed work conformed with the contract specifications"). Kenneth Krommen-

tractor. Instead, the focus of the inquiry is "factual indicia of control or right to control." *Kerl v. Dennis Rasmussen, Inc.,* 2004 WI 86, ¶ 24, 273 Wis. 2d 106, 682 N.W.2d 328.

acker, a Stearns' employee since 1974, similarly testified as to Stearns' lack of control:

> Q [Attorney Rakauski, on behalf of Tatera]: Do you have an understanding of what B&M was actually doing to these parts?
>
> A [Krommenacker]: Other than machining them, no.

Accordingly, contrary to Tatera's argument otherwise, B&M served as an independent contractor to FMC, the principal employer.

¶ 21.  Because we conclude that the relationship between FMC and B&M is properly characterized as one of principal employer and independent contractor, *Wagner*'s general rule of non-liability controls. That is, unless one of the two exceptions applies, FMC is not liable in tort for injuries sustained by Walter, B&M's employee, while he was machining the friction disks. We address each of the exceptions in turn.

## A. Affirmative Act of Negligence

¶ 22.  A principal employer may be liable to an independent contractor's employee for injuries caused by the principal employer's affirmative act of negligence. *Wagner,* 143 Wis. 2d at 388. This exception was first articulated in *Barth,* in which this court concluded that "something extra," meaning an affirmative act of negligence that increased the risk of injury, is necessary to sustain an action against a principal employer brought by an independent contractor's employee. 71 Wis. 2d at 783; *see also Danks,* 298 Wis. 2d 348, ¶ 17. The relevant inquiry is whether the alleged negligent act "was an act of *commission* constituting an affirma-

tive act of negligence or whether it was an act of *omission* which does not rise to the level of an affirmative act." *Wagner,* 143 Wis. 2d at 389. Accordingly, even though the traditional concept of negligence would impose liability for a negligent omission, in addition to a negligent affirmative act, *see* Wis JI—Civil 1005, Wisconsin case law precedent requires more than an omission in order to impose liability on a principal employer for injuries sustained by an independent contractor's employee. The principal employer's alleged negligent act must be affirmative.

¶ 23.  For example, in *Wagner,* we concluded that the act of negligently hiring an independent contractor to perform demolition work did not constitute an affirmative act of negligence but rather an omission. 143 Wis. 2d at 390. The defendants' failure to check the independent contractor's credentials could not be viewed as active misconduct; instead, it was " 'passive inaction or a failure to take steps to protect' the plaintiff from harm." *Id.* (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 56, at 373 (5th ed. 1984)); *see also Snider,* 81 Wis. 2d at 239 (concluding that the plaintiffs' argument that the principal employer's failure to furnish supervisory control over its independent contractors constituted an affirmative act of negligence "defie[d] the commonly accepted meaning of 'affirmative' ").

¶ 24.  In *Estate of Thompson,* the estate of an independent contractor's employee sought to hold the principal employer liable for the employee's death on account of the principal employer's alleged affirmative acts of negligence. 225 Wis. 2d at 600–01. In that case, Thompson, employed by Emblom Brothers Construction Company (Emblom), was fatally electrocuted while removing a utility pole carrying energized lines. *Id.* at

591. Emblom had a contract with Jump River Electric Cooperative (Jump River) to construct an overhead electrical distribution line, which entailed removing old utility poles, installing new ones, and transferring the electrical lines. *Id.* Thompson was electrocuted while holding a support wire that touched an energized wire. *Id.* At the time, Thompson was not wearing protective rubber gloves, despite Emblom's instructions otherwise. *Id.*

¶ 25. Thompson's estate argued that it was permitted to bring an action in tort against Jump River, despite the principal employer's general non-liability, on the grounds that Jump River committed affirmative acts of negligence. *Id.* at 600. In particular, the estate alleged that Jump River committed various safety violations, negligently designed the new electrical distribution line, failed to incorporate safety precautions into the design, allowed the support wire to hang from the old utility pole before the pole's removal, and failed to remedy and take precautions against the danger those situations presented. *Id.* The estate further alleged that the circuit court erroneously granted Jump River's motion for summary judgment because a genuine issue of material fact existed concerning whether Jump River knew or should have known of the dangerous safety violations. *Id.*

¶ 26. The court of appeals affirmed the circuit court's order granting summary judgment to Jump River, concluding that Jump River's alleged negligent conduct did not constitute affirmative acts of negligence but instead " 'passive inaction or a failure to protect the plaintiff from harm.' " *Id.* at 601 (quoting *Wagner,* 143 Wis. 2d at 390). The court determined that Jump River's alleged negligence "lay in its failure to discover and act regarding safety violations," *id.*, and its

"fail[ure] to incorporate safety precautions in its alleg-edly dangerous design," *id.* at 602, both of which constituted passive inaction for which Jump River could not be held liable. *Id.* at 601–02.

¶ 27.   Similarly, in *Danks,* the court of appeals held as a matter of law that a principal employer was not liable for injuries sustained by the independent contractor's employee because neither the principal employer nor its employee committed affirmative acts of negligence. 298 Wis. 2d 348, ¶ 2. In that case, Danks, an employee of C&R Concrete (C&R), was injured while assisting in loading a truss onto a truck at a construc-tion site. *Id.,* ¶ 4. C&R had been hired by Stock Building Supply, Inc. (Stock) to load trusses by crane onto Stock's flatbed truck. *Id.,* ¶ 1. Stock's employee, Wagner, drove to the construction site in the truck and parked it. *Id.,* ¶¶ 11–12. Wagner then stood on the flatbed and used hand signals to direct the crane operator, C&R's owner, as to the direction the truss should move and when it should be lowered. *Id.,* ¶ 12. Danks was positioned at the rear of the flatbed, using a two-by-four to guide the truss onto the truck. *Id.* When the truss was about eight feet above the truck bed, it fell, and Danks was discovered laying on the street near the rear of the truck. *Id.,* ¶ 13. Danks suffered a spinal cord injury from the accident. *Id.,* ¶ 4.

¶ 28.   The circuit court dismissed Danks' tort claims against Stock and Wagner, and Danks appealed. *Id.,* ¶ 1. Danks argued that Stock was not protected by the general rule of non-liability because, inter alia, Wagner committed an affirmative act of negligence: he was in a position to see that the truss was improperly attached to the crane cable but failed to warn Danks or C&R's owner that the truss was being lifted and moved in an improper and hazardous manner. *Id.,* ¶ 33. The

court of appeals rejected Danks' argument, concluding that Wagner's conduct was "at most 'passive misconduct,'" "not an affirmative act of negligence that increased the risk of harm to Danks from the loading operation." *Id.*

■■ ■■

¶ 29. Turning to the facts of the case now before this court, we conclude that FMC's alleged negligent conduct did not constitute an affirmative act of negligence. The allegations in Tatera's complaint are grounded in FMC's alleged omission, namely, the failure to warn Walter and B&M of the health hazards associated with asbestos and asbestos-containing products. Specifically, the complaint alleges five negligent acts: (1) the failure to adequately warn of the health hazards of asbestos; (2) the failure to warn of the danger and harm of the asbestos after the products or equipment were installed at the premises; (3) the failure to investigate or test for the health effects of asbestos prior to distribution and sale; (4) the failure to instruct in the use of precautionary measures relating to asbestos-containing products; and (5) the manufacture, supply, installation, or removal of unsafe asbestos-containing products.[17] The first four alleged negligent acts are disposed of with dispatch. By definition, the failure to warn, the failure to investigate or test, and the failure to instruct are omissions, not affirmative acts. As the court of appeals recognized in *Danks,* the failure to

---

[17] Stearns, on FMC's behalf, supplied the asbestos-containing friction disks to B&M. It is undisputed that every asbestos-containing friction disk supplied to B&M from Stearns was not manufactured by Stearns. Instead, Stearns purchased the friction disks from several different manufacturers. Accordingly, as to FMC, we are concerned only with the act of "supply[ing] . . . unsafe asbestos-containing products."

warn is "at most 'passive misconduct,' " not an affirmative act of negligence. 298 Wis. 2d 348, ¶ 33. Likewise, FMC's alleged failure to investigate or test for the health effects of asbestos is akin to Jump River's alleged failure to discover and act regarding the electrical safety violations in *Estate of Thompson, see* 225 Wis. 2d at 601; such conduct does not constitute an affirmative act of negligence but rather " 'passive inaction or a failure to take steps to protect' the plaintiff from harm." *Wagner,* 143 Wis. 2d at 390 (quoting W. Page Keeton et al., *supra,* § 56, at 373).

¶ 30.   The fifth negligent act alleged against FMC relates to FMC supplying the asbestos-containing friction disks to B&M to be machined. Though not as explicit as the previous four, this act is also grounded in FMC's alleged failure to warn. Contrary to Tatera's argument and the court of appeals' conclusion otherwise, *see Tatera,* 319 Wis. 2d 688, ¶ 51,[18] the act of supplying the asbestos-containing friction disks to B&M does not itself constitute an affirmative act of negligence. The act of supplying the asbestos-containing friction disks is no doubt "affirmative," but the mere fact that FMC supplied the disks to B&M is not enough to impose liability on FMC for committing an affirmative act of *negligence.* That is, supplying a dangerous chattel does not alone give rise to negligence. The crux of Tatera's claim is the alleged failure to warn

---

[18] The court of appeals concluded that in this case, "the negligent act was an affirmative act. The act was supplying the asbestos-containing brake linings to B&M's employees for grinding. It was FMC's affirmative act of providing the materials to B&M, and intending that the employees would grind them down to the correct shapes and sizes." *Tatera,* 319 Wis. 2d 688, ¶ 51.

of the dangerousness of the chattel supplied. *See* Restatement (Second) of Torts § 388. As previously discussed, the failure to warn is not an affirmative act. *Danks,* 298 Wis. 2d 348, ¶ 33.

¶ 31.   Tatera attempts to create an exception to the general rule protecting principal employers from liability by imposing traditional negligence liability under § 388 onto a principal employer that supplies a chattel to an independent contractor to be machined. However, permitting such liability to attach would completely undermine our three decades of precedent that requires an affirmative act of negligence. Liability for supplying a dangerous chattel is necessarily premised in failing to warn of the chattel's dangerousness, an omission. *See* Restatement (Second) of Torts § 388(c); *see also Strasser,* 236 Wis. 2d 435, ¶ 58; Wis JI—Civil 3242. The affirmative act exception would be eviscerated if a principal employer's liability is met through an omission. We decline to so hold and thereby overturn over three decades of precedent. Because FMC's alleged negligent conduct did not constitute an affirmative act of negligence, the first exception to *Wagner's* general rule of non-liability is here inapplicable.

## B. Extrahazardous Activity

██ ██

¶ 32.   A second exception renders an otherwise protected principal employer liable for injuries sustained by an independent contractor's employee. A principal employer may be liable for injuries sustained by an independent contractor's employee while he or she is engaged in an extrahazardous activity. *Wagner,* 143 Wis. 2d at 401; *see also Estate of Thompson,* 225

Wis. 2d at 595–96. An extrahazardous activity[19] is "one in which the risk of harm remains unreasonably high no matter how carefully it is undertaken." *Wagner,* 143 Wis. 2d at 392. An activity that is extrahazardous is contrasted with one that is "inherently dangerous because of the absence of special precautions." *Id.* at 393. An employee engaged in an inherently dangerous activity can take steps to minimize the risk of injury. *Id.* at 392. In *Wagner,* this court expressly declined to recognize a cause of action by an independent contractor's employee against a principal employer for injuries sustained while engaged in the latter type of activity. *Id.* at 393, 400–01.

¶ 33. The distinction between an extrahazardous activity and an inherently dangerous activity is not always obvious, and accordingly, some examples are instructive. In *Estate of Thompson,* the court of appeals held that working with high voltage electricity is inherently dangerous, not extrahazardous. 225 Wis. 2d at 596. The court concluded that when Thompson was electrocuted, he was not engaged in an activity in which the risk of harm remained unreasonably high no matter how carefully it was undertaken. *Id.* Instead, steps could have been taken to minimize the risk of Thompson's injury, including wearing rubber gloves, using mechanical equipment to remove the utility pole, or covering the pole. *Id.* As the court of appeals recognized, in order for an activity to be taken out of the

---

[19] In our case law, the term "extrahazardous" is used synonymously with the term "abnormally dangerous." *See Wagner,* 143 Wis. 2d at 392; *Danks v. Stock Bldg. Supply, Inc.,* 2007 WI App 8, ¶ 23 n.4, 298 Wis. 2d 348, 727 N.W.2d 846; *Estate of Thompson,* 225 Wis. 2d at 595 n.5.

realm of extrahazardous, "the risk of injury need not be eliminated, just minimized." *Id.*

¶ 34. The Seventh Circuit Court of Appeals decision in *Anderson* is especially on point. In that case, the court held that sandblasting oil storage tanks could not be considered abnormally dangerous[20] because the record demonstrated that an employee engaged in sandblasting could take precautions to minimize the risk of injury. 801 F.2d at 940. Anderson, a sandblaster employed by Tri-Kote, Inc. (Tri-Kote) from 1970 until 1983, died from silicosis, a serious lung disease caused by breathing in silicon dust over a long period of time. *Id.* at 938. Throughout his employment, Anderson worked mainly on Tri-Kote's contract with Marathon Petroleum Company (Marathon) to clean the inside of Marathon's oil storage tanks by sandblasting. *Id.* Anderson's widow sought to hold Marathon liable for her husband's death, alleging that his silicosis was caused by sandblasting in the confined storage tanks and thereby breathing in clouds of silicon dust. *Id.* Evidence was introduced that up until 1980, the only form of mask that Anderson wore to protect himself from silicon dust was a "desert hood," consisting of wire mesh in front of his nose and mouth. *Id.*

¶ 35. The Seventh Circuit declined to except Anderson's tort claim from the general rule that an independent contractor's employee has no common law tort right against the principal employer. *Id.* at 940. According to the record, sandblasting could not be

---

[20] Similar to the definition applied by Wisconsin courts, "abnormally dangerous" activity was defined by the Anderson court as one which "might very well result in injury even if conducted with all due skill and caution." *Anderson v. Marathon Petroleum Co.*, 801 F.2d 936, 939 (7th Cir. 1986).

classified as abnormally dangerous because sandblasters could take steps to reduce the risk of serious injury. *Id.* Specifically, "if the sandblaster is equipped not with the ridiculous 'desert hood' but with a proper face mask to which a fresh-air hose is attached, so that the worker is breathing fresh air rather than air filled with silicon dust, the worker is in no danger." *Id.*

¶ 36.  In this case, we conclude as a matter of law that machining an asbestos-containing friction disk is not an extrahazardous activity because steps may be taken to minimize the risk of injury.[21] Therefore, while inherently dangerous, the activity of machining an asbestos-containing friction disk does not create an exception to FMC's protection from tort liability. Similar to working with high voltage electricity, *Estate of Thompson,* 225 Wis. 2d at 596, and sandblasting in a confined space, *Anderson,* 801 F.2d at 940, the activity of machining an asbestos-containing disk is not extrahazardous because the risk of injury can be minimized by wearing protective equipment and taking proper precautions. *See* 29 C.F.R. § 1926.1101(g) (2009); United States Department of Labor: Occupational Safety & Health Administration (OSHA), Asbestos Control, http://www.osha.gov/SLTC/asbestos/control. html (last visited July 9, 2010) (providing that exposure

---

[21] It is important to note that the proper inquiry is not whether Walter was working with or exposed to an extrahazardous *material. See Tatera,* 319 Wis. 2d 688, ¶¶ 52, 53 (citing *Wausau Tile, Inc. v. Cnty. Concrete Corp.,* 226 Wis. 2d 235, 261, 593 N.W.2d 445 (1999)). Instead, our focus is whether, when performing the contracted work, the injured employee was engaged in an extrahazardous *activity. See Wagner,* 143 Wis. 2d at 402. In this case, in performing B&M's contracted work for FMC, Walter was engaged in the activity of machining asbestos-containing friction disks. We must therefore determine whether that activity is extrahazardous.

to asbestos in friction products can be prevented by engineering controls, administrative actions, and wearing personal protective equipment). In particular, the National Institute of Occupational Safety and Health (NIOSH) has approved respirators for protecting employees from breathing air contaminated with asbestos dust. *See* 29 C.F.R. § 1910.134; National Cancer Institute, Asbestos Exposure and Cancer Risk 4 (2009), http://www.cancer.gov/images/documents/5ac7d2fc-27 df-4ecc-839f-dc5bc1909e01/FS3_21.pdf (stating that construction and industrial workers can protect themselves from asbestos exposure by wearing NIOSH-approved respirators). Accordingly, if while machining the asbestos-containing friction disks, Walter had been equipped with a proper respirator as opposed to a simple surgical mask, his risk of inhaling asbestos dust and developing mesothelioma would have been minimized. The activity of machining an asbestos-containing friction disk is therefore not "one in which the risk of harm remains unreasonably high no matter how carefully it is undertaken" and cannot be classified as extrahazardous. *See Wagner,* 143 Wis. 2d at 392.

¶ 37.   In summary, we conclude that FMC's alleged negligent conduct did not constitute an affirmative act of negligence, and machining an asbestos-containing friction disk is not an extrahazardous activity. Therefore, Tatera's negligence claim against FMC is not excepted from the general rule articulated in *Wagner.* FMC, as a principal employer, is not liable in tort for injuries sustained by Walter, the independent contractor's employee, while he was performing the contracted work of machining asbestos-containing friction disks. Because we hold as a matter of law that FMC is not liable in tort to Tatera, Tatera's negligence claim under Restatement (Second) of Torts § 388 is necessarily barred.

## IV. CONCLUSION

¶ 38. We conclude that Tatera's negligence claim against FMC falls within the general rule that a principal employer is not liable in tort for injuries sustained by an independent contractor's employee while he or she is performing the contracted work. In this case, neither of the two exceptions to that general rule applies. First, even accepting Tatera's allegations as true, we conclude that FMC's conduct did not constitute an affirmative act of negligence. Rather, Tatera's allegations of negligence are grounded in FMC's alleged omissions. By definition, the negligent failure to warn, failure to investigate or test, and failure to instruct are omissions, not affirmative acts of negligence. Moreover, the act of supplying asbestos-containing friction disks does not itself constitute an affirmative act of negligence because liability for such an act is necessarily premised in failing to warn, an omission. Second, we conclude that machining an asbestos-containing friction disk does not qualify as an extrahazardous activity because steps may be taken to minimize the risk of injury. Because we hold as a matter of law that FMC is not liable in tort to Tatera, Tatera's negligence claim under Restatement (Second) of Torts § 388 is necessarily barred.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 39. N. PATRICK CROOKS, J. (*dissenting*). This case clearly demands the opposite result from that reached by the majority. The plaintiffs, Vicki Tatera and the Estate of Walter Tatera (collectively, Tatera), at a minimum, established their right to a trial on their claim for negligence based on an affirmative act of the defendant, FMC, in which it supplied Walter Tatera's

employer with asbestos-containing friction disks for grinding without warning the employer of the disks' dangerous content. Accordingly, granting summary judgment for the defendant, FMC, is clearly inappropriate. The majority's decision to deny Tatera a trial under the circumstances presented here is not defensible.

¶ 40. Summary judgment is a drastic remedy, primarily because it denies the nonmoving party a trial. Accordingly, it is the circuit court's and reviewing courts' duty to consider these motions carefully and prudently. In this case, the circuit court did not fulfill its duties in that regard, and the majority, by affirming that court's conclusion, fails to fulfill its duties as well.

¶ 41. Rather, like the court of appeals, I would conclude that summary judgment here is inappropriate for the following two reasons. First, there are genuine issues of material fact in this case as to whether Tatera's proofs support the elements of Restatement (Second) Torts § 388 (1965) (hereinafter described as "§ 388" or "section 388"). Second, I am satisfied that to the extent that it is proper under these circumstances to apply *Wagner v. Continental Cas. Co.,* 143 Wis. 2d 379, 388, 421 N.W.2d 835 (1988) (holding that generally, contractors are not liable in tort for the injuries to employees of a subcontractor), it does not bar Tatera's claim because the affirmative act exception to its rule applies. Accordingly, it seems quite inappropriate to grant summary judgment for FMC in this situation, and Tatera should have an opportunity to move forward to a trial. Hence, I dissent.

¶ 42. To demonstrate how far afield the circuit court's decision—and the majority's affirmation of it—stray from the principles underlying summary judgment, it is important to discuss the methodology for assessing motions for summary judgment at the circuit

court and appellate court levels. A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Wis. Stat. § 802.08(2) (emphasis added). As we have observed, summary judgment is a "drastic remedy" that denies the nonmoving party a trial. *Lecus v. Am. Mut. Ins. Co.,* 81 Wis. 2d 183, 189, 260 N.W.2d 241 (1977). Reviewing a motion for summary judgment should "not . . . be a trial on affidavits and depositions." *Id.* The moving party must "leave no room for controversy." *Schlumpf v. Yellick,* 94 Wis. 2d 504, 512, 288 N.W.2d 834 (1980).

¶ 43.    We explained the methodology for a circuit court to use when reviewing a motion for summary judgment in *Grams v. Boss,* 97 Wis. 2d 332, 294 N.W.2d 473 (1980). First, the circuit court "examines the moving party's . . . affidavits or other proof to determine whether the moving party has made a prima facie case for summary judgment under [Wis. Stat. § ]802.08(2)." *Id.* at 338. To successfully make a prima facie case for summary judgment, "a moving defendant must show a defense [that] would defeat the plaintiff." *Id.*

> If the moving party has made a prima facie case for summary judgment, the court must examine the affidavits and other proof of the opposing party . . . to determine whether there exist disputed material facts, or undisputed material facts from which reasonable alternative inferences may be drawn, sufficient to entitle the opposing party to a trial.

*Id.*

¶ 44.    Our methodology in reviewing a motion for summary judgment is identical to that of the circuit

court, and our review of the decision of the court of appeals is to review the circuit court's decision to grant summary judgment. *See Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 314–15, 401 N.W.2d 816 (1987). Accordingly, it is important to chronicle what happened at the circuit court hearing on the motion for summary judgment as it relates to Tatera's negligence claim.

¶ 45. As the majority observed, Vicki Tatera filed a claim for negligence against FMC[1] in 2004 on behalf of herself and her deceased husband, Walter Tatera (Walter), who died in 2004 shortly after being diagnosed with malignant mesothelioma. Walter was a full-time employee with B&M Machine Products (B&M) from 1968 to 1993. One of Walter's duties during his employment at B&M was to grind and cut friction disks used in industrial electric brake systems. The disks, which were made by several manufacturers and sold to FMC, were supplied by FMC to B&M to shape them to FMC's desired specifications and then return the finished disks to FMC to install in brake systems. That process of machining the disks caused a significant amount of dust to accumulate in the B&M shop. At least until 1986, the disks FMC supplied to B&M contained asbestos.

¶ 46. FMC moved for summary judgment on the basis that the rule in *Wagner,* protecting a principal employer from liability for torts committed against employees of its independent contractors, prevented Tatera's suit from moving forward.[2] It asserted that

---

[1] Tatera made other claims against FMC; however, only the negligence claim is pertinent to our review.

[2] As the majority noted, FMC first moved for summary judgment in May 2006, and the Milwaukee County Circuit Court, Judge Clare L. Fiorenza, presiding, denied the motion in

neither of the exceptions to the *Wagner* rule applied, i.e., that FMC had not committed an affirmative act of negligence and that machining friction disks containing asbestos was not extrahazardous. In response, Tatera asserted that the circumstances here gave rise to a claim under Restatement (Second) of Torts § 388, which provides that "one who supplies directly or through a third person a chattel for another to use" is liable in tort if it can be shown that the supplier knew or had reason to know that the product is dangerous, the supplier had no reason to believe those using the product would recognize its dangerousness, and the supplier fails to warn those users of the dangerous condition. Tatera argued that because § 388 provided them a method of recovery in tort, they established that FMC committed an affirmative act and *Wagner* was inapplicable. However, Tatera also argued that, in the alternative, to the extent that *Wagner* did apply, it did not bar the claim because the extrahazardous activity exception to the *Wagner* rule applied.

¶ 47. To accompany their response to FMC's motion for summary judgment, Tatera provided appropriate evidence to support their claim. First, Tatera included excerpts of a deposition of Raymond Mazurek (Mazurek), an FMC employee, that indicated that

September 2006. However, due to judicial rotation, Judge Timothy G. Dugan replaced Judge Fiorenza as the presiding judge in this case in August 2007. FMC renewed its motion for summary judgment, and Tatera objected, but Judge Dugan agreed to hear the motion.

It is Judge Dugan's November 2007 grant of summary judgment for FMC that is the focus of our review. However, I believe that it is significant that Judge Fiorenza denied FMC's first motion for summary judgment, which appeared to be roughly identical to the motion assessed by Judge Dugan.

(1) FMC purchased asbestos-containing friction disks in the 1970s and 1980s; (2) that FMC knew that some of the materials on those disks contained asbestos; (3) in 1974 and 1975, FMC tested some of those materials for asbestos content and that that testing produced documents that Mazurek had observed; (4) FMC likely started supplying material safety data sheets, which would have contained information regarding materials that were in the disks, when OSHA required them to do so, which was in the late 1970s or early 1980s; (5) FMC supplied those data sheets to customers upon request, but Mazurek was unaware of whether FMC provided those data sheets to machine shops or specifically, B&M; and (6) FMC never put warnings in or on the boxes containing on its asbestos-containing products.

¶ 48.  Tatera also provided an affidavit from Richard Hatfield (Hatfield), a scientist who was knowledgeable about asbestos-containing brake and clutch materials, and who had conducted studies measuring "how much asbestos is released from the abrasion of brakes, clutches[,] and friction wear dust." His studies indicated that asbestos-containing friction materials can release asbestos fibers from minimal abrasion to the material's surface. His studies indicated that, in fact, asbestos dust is present in boxes containing unused brakes or clutches. Accordingly, he explained that it is unnecessary "for asbestos-containing friction materials to undergo substantial changes before these materials will release asbestos fibers."

¶ 49.  Finally, Tatera also produced an affidavit from Dr. Henry Anderson, a physician who specialized in occupational and environmental medicine, as well as diseases caused by asbestos exposure. Dr. Anderson stated that, in his opinion "the vast majority of malignant mesothelioma cases are caused by asbestos expo-

sure." He further indicated that "all" exposures to asbestos occurring more than ten years before the diagnosis of malignant mesothelioma contribute to the disease; that malignant mesothelioma, in general, "has a latency period of [20] to [40] years after exposure to asbestos"; and that there is no known level of "safe" exposure to asbestos, below which there would be no risk of developing malignant mesothelioma.

¶ 50. After a hearing, the circuit court granted summary judgment to FMC and dismissed Tatera's negligence claim, holding that § 388 did not apply to FMC because that section applied only to manufacturers, and FMC did not manufacture the disks. The circuit court further concluded that because Tatera was the employee of an independent contractor, the general rule in *Wagner* barring claims against a contractor by an injured employee of a subcontractor applied, and neither of the two exceptions to that rule applied. Because of that, the circuit court reasoned, FMC was not liable. It granted FMC's motion for summary judgment and dismissed Tatera's negligence claim.

¶ 51. The court of appeals reversed, holding that (1) § 388 applies to suppliers such as FMC; (2) *Wagner* did not bar Tatera's claim because both the affirmative act and extrahazardous activity exceptions applied; and (3) Tatera had offered sufficient proofs that there were genuine issues of material fact as to whether the claim satisfied the elements of § 388.

¶ 52. To reiterate, this court's task, in reviewing the decision of the court of appeals, is to review the circuit court's decision to grant summary judgment to FMC. Consistent with our summary-judgment methodology, then, this court is to look to Tatera's proofs, as the nonmoving party, in the light most favorable to it. Based on that examination, we will not reverse the

circuit court's grant of summary judgment unless the record reveals that there are genuine issues of material fact and that the moving party—in this case, FMC—is not entitled to judgment as a matter of law. *See Strasser v. Transtech Mobile Fleet Serv., Inc.*, 2000 WI 87, ¶ 28, 236 Wis. 2d 435, 613 N.W.2d 142.

¶ 53.  To begin, there appear to be open questions presented by the parties that the majority does not acknowledge. Namely, for an employee in Walter Tatera's situation, must the rule in *Wagner* limiting the liability of a principal for torts involving the employee of an independent contractor apply?[3] Or is the proper theory of liability the rule under § 388 imposing liabil-

---

[3] The court of appeals acknowledged that whether *Wagner* should be applied here is unclear. *See Tatera v. FMC Corp.*, 2009 WI App 80, ¶ 49, 319 Wis. 2d 688, 768 N.W.2d 198 (stating that its application of *Wagner* was on the basis of "assuming (without deciding)" that it applied).

Additionally, I am unaware of any cases from this court or the court of appeals applying *Wagner* or the affirmative act analysis for purposes of determining liability of a principal in tort in a case involving chattel. The few published cases from Wisconsin appellate courts applying *Wagner* are construction and utility cases, not cases involving a chattel. *See, e.g., Danks v. Stock Bldg. Supply, Inc.*, 2007 WI App 8, 298 Wis. 2d 348, 727 N.W.2d 846 (involving an injury to an employee of a subcontractor hired to load a truss at construction site); *Estate of Thompson v. Jump River Elec. Coop.*, 225 Wis. 2d 588, 593 N.W.2d 901 (Ct. App. 1999) (involving an injury to an employee of a subcontractor hired to remove utility poles). Moreover, the pre-*Wagner* cases from our appellate courts in which the courts assessed whether a principal committed an affirmative act for purposes of establishing liability also were construction or utility—not chattel—cases. *See, e.g., Barrons v. J.H. Findorff & Sons, Inc.*, 89 Wis. 2d 444, 278 N.W.2d 827 (1979) (construction case); *Snider v. N. States Power Co.*, 81 Wis. 2d 224, 260 N.W.2d 260 (1977) (utility case).

ity on a supplier who fails to warn of a known, dangerous condition to unsuspecting users? Or do both rules apply? Moreover, if both *Wagner* and § 388 apply, how (and in what order) does a court apply those two rules, which are based on competing policies regarding liability? Rather than answer those difficult questions, the majority summarily concludes that because B&M is an independent contractor, *Wagner* must apply. Majority op., ¶ 21. It then holds that Tatera's claim does not fit under either of the two narrow exceptions that would allow liability to extend to FMC.

¶ 54.  In my view, regardless of whether *Wagner* applies exclusively, § 388 applies exclusively, or both apply, FMC is not entitled to summary judgment in this case. Again, the methodology we have set forth for reviewing a grant of summary judgment requires us to determine (1) whether Tatera raised genuine issues of material fact and (2) whether FMC is entitled to judgment as a matter of law. I agree with the court of appeals' conclusion that § 388 is applicable to this case; that Tatera set forth genuine issues of material fact and as to the elements of § 388; and that, to the extent that *Wagner* applies, it does not bar Tatera's claim. Accordingly, FMC is not entitled to judgment as a matter of law.

¶ 55.  First, a grant of summary judgment for FMC is improper because Tatera has, at a minimum, established a prima facie case under § 388. Section 388, which Wisconsin has adopted, *see Strasser,* 236 Wis. 2d 435, ¶ 58, provides:

§ 388. Chattel Known to be Dangerous for Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability to

361

those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

¶ 56.   I agree with the court of appeals' conclusion that § 388 applies to FMC as a supplier. The text of the rule clearly designates that it applies to suppliers. The comments attached to the section support that conclusion. *See* Restatement (Second) of Torts § 388 cmt. a (describing supplier as "one who lends" a chattel); *id.,* cmt. c ("These rules, therefore, apply to sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person."); *id.,* cmt. d ("One supplying a chattel to be used or dealt with by others is subject to liability under the rule stated in this Section . . . ."). Here, FMC is a supplier, given that it provided the friction disks to B&M for grinding. Accordingly, nothing clearly precludes § 388 from applying under these circumstances.

¶ 57.   Looking at Tatera's proofs in the light most favorable to Tatera, I also agree with the court of appeals that Tatera established a prima facie case under § 388. I reach that conclusion on the basis of Tatera's proofs, including (1) Mazurek's deposition de-

scribing FMC's knowledge of the friction disks' asbestos content, the extent to which FMC used material data safety sheets, and that to Mazurek's knowledge, FMC never placed warnings on the products; (2) Dr. Hatfield's affidavit as to the causal relationship between asbestos exposure and diagnosis of malignant mesothelioma; and (3) Hatfield's studies indicating that asbestos-containing products such as friction disks will release asbestos fibers absent any "substantial changes" to the material.

¶ 58.  In its briefs to this court, FMC does not put forth arguments as to whether it believes that Tatera failed to state facts supporting the elements of § 388. Rather, it endorses the circuit court's conclusion that § 388 is inapplicable and argues, alternatively, that even if Tatera had asserted a claim of liability against FMC pursuant to § 388, that claim is still barred by *Wagner* because the claim is not premised upon an "affirmative act" of negligence and because machining asbestos-containing friction disks is not extrahazardous. That is the approach that the majority appears to adopt although it does not state as much or explain its rationale.

¶ 59.  Nevertheless, assuming that *Wagner* is applicable to this case, FMC is not entitled to judgment as a matter of law because at least one of the exceptions to its rule shielding principals from liability—the affirmative act exception—applies here.

¶ 60.  In *Wagner,* we stated the general rule that employees of a subcontractor cannot bring a claim for negligence against the principal contractor unless at least one of two exceptions applies. *Wagner,* 143 Wis. 2d at 388. First, a principal employer may be liable for injuries to the independent contractor's employee "caused by the principal employer's affirmative act of negligence." *See id.* Second, if the employee's injuries occur "while performing inherently dangerous activi-

ties," a principal employer may be held liable. *See id.* My focus is on the affirmative act of negligence exception.

¶ 61.   This court has had only a few opportunities to explain what sort of behavior might constitute an affirmative act of negligence. In those cases, it is notable that we have yet to explain what an affirmative act is; rather, we have only explained what an affirmative act is *not.* For example, in *Wagner,* a contractor hired a subcontractor to do demolition work. Wagner, an employee of the subcontractor, was injured in the course of the demolition, and evidence indicated that the subcontractor did not have sufficient equipment or take proper safety precautions. *Id.* at 383. Wagner sued the principal contractor, alleging that it was liable for his injuries, because it had negligently hired the subcontractor when it failed to check if the subcontractor had proper equipment and followed necessary safety procedures. *Id.* at 382–84. The court held that the principal employer was not liable for Wagner's injuries because it had not committed an "affirmative act of negligence" when it neglected to check the credentials of the subcontractor who employed Wagner. *Id.* at 390.

¶ 62.   Similarly, in *Barth v. Downey,* 71 Wis. 2d 775, 782–84, 239 N.W.2d 92 (1976), the first case in which we articulated the "affirmative act" standard, we held that the failure to provide a safe working environment was not an affirmative act. Likewise, other cases in which we or the court of appeals have considered this question have found similarly passive acts such as to a failure to investigate or failure to provide a safe working environment not to be affirmative acts. *See Danks,* 298 Wis. 2d 348, ¶ 26 (failure to check credentials of a subcontractor is not an affirmative act); *Estate of Thompson,* 225 Wis. 2d at 601 (failure to discover and act upon safety violations is not an affirmative act).

¶ 63. The majority seems to understand those cases to stand for the proposition that an allegation that includes any "failure" to do something is necessarily an omission and therefore not an affirmative act of negligence. *See* majority op., ¶ 3 (stating that the act here cannot be an affirmative act of negligence "because liability for such an act is necessarily premised in failing to warn, an omission"); ¶ 31 (stating that to permit liability to attach to a principal where an omission is present "would completely undermine our three decades of precedent that requires an affirmative act of negligence").

¶ 64. That conclusion appears to be indefensible. Negligence, by its very definition, includes some sort of failure or omission. *See* Wis. JI—Civil 1005 ("A person is negligent when (he) (she) *fails* to exercise ordinary care.") (emphasis added). It is impossible to have an "affirmative act of negligence" without some sort of failure to act occurring somewhere in the chain of causation. An affirmative act of negligence, at the very least, must include a combination of an affirmative act linked with an act of negligence that, when taken together, could have caused the harm alleged.

¶ 65. Here, the act is patently unlike the acts described in the above cases: FMC supplied B&M with asbestos-containing disks for B&M's employees to grind without warning them of the disks' content. Supplying the asbestos-containing disks is an affirmative act, failing to warn of the disks' dangerous content is the act of negligence, and the harm alleged is death by a disease known to be caused by exposure to asbestos. If this act is not an affirmative one, I fail to see what act could possibly fit within the affirmative act exception.

¶ 66. In some regard, it appears that the majority recognizes that point. To avoid reaching the same

conclusion that I do, however, it breaks down the act in question by its individual components and disposes of each component on the basis that it is insufficient—on its own—to be an affirmative act of negligence. Its bases its description of FMC's alleged affirmative act from Tatera's complaint, word for word.[4] *See* majority op., ¶¶ 2, 9. That complaint listed five allegations, four of which describe failures to warn, to investigate, and to instruct, and one of which that alleges that FMC "[m]anufactured, supplied, installed, or removed unsafe asbestos-containing products." *Id.* It then takes each allegation to be a literal description of the act. That methodology allows it to dispatch with the first four acts describing a "failure," because "[b]y definition, the failure to warn, the failure to investigate or test, and the failure to instruct are omissions, not affirmative acts." Majority op., ¶ 29. In other words, in the majority's view, FMC's "failures" may have been negligent, but those failures are not affirmative acts.

¶ 67. Yet, the majority then considers the fifth allegation—supplying asbestos-containing friction disks—and knocks it down with the opposite reasoning

_____

[4] Well, almost word for word: the majority ignores an important conjunction. In the complaint, Tatera listed five allegations of negligence, linked by "and/or," which would suggest that any one of the allegations or a combination thereof would constitute a claim. *See* American Heritage Dictionary of the English Language 109 (3d ed. 1992) (defining "and/or" as "[u]sed to indicate that either or both of the items connected by it are involved"). The majority ignores that distinction, and assesses each allegation on its own, essentially replacing the "and/or" in the allegation with "or." *See* majority op., ¶¶ 2, 29–30. To the extent that the majority is insisting that courts must base decisions on whether something is an affirmative act on text of the plaintiff's complaint, the majority should, at a minimum, accurately reflect that text.

by which it dismissed the first four. It writes, "The act of supplying the asbestos-containing friction disks is no doubt 'affirmative,' but the mere fact that FMC supplied the disks to B&M is not enough to impose liability on FMC for committing an affirmative act of *negligence*." Majority op., ¶ 30 (majority's emphasis). By the majority's reasoning, it seems, FMC may have acted affirmatively in that fifth allegation but not negligently.

¶ 68.   I believe that the majority's logic is twisted. If the first four allegations are not affirmative acts because they merely state allegations of negligence, how could the affirmative act, i.e., supplying the disks, *not* fill that gap? Essentially, Tatera loses the opportunity to move forward to trial, not so much based on an application of law to the circumstances presented in this case, but because Tatera's counsel formatted the allegations in the complaint in the manner that it did.

¶ 69.   Because FMC committed an affirmative act when it provided asbestos-containing friction disks to B&M for its employees to grind and manipulate without warning of the dangerous content, *Wagner*—to the extent that case applies—does not operate to bar Tatera's claim.[5] Accordingly, FMC is not entitled to summary judgment on that basis and Tatera's claim for negligence should go forward. Moreover, as explained herein, Tatera raised genuine issues of material fact as to whether the elements of § 388 are satisfied. Hence, FMC is not entitled to summary judgment on that basis.

---

[5] The court of appeals also determined that the extrahazardous exception applies. I do not address that exception here because it is unnecessary for me to do so. Because, in my view, the affirmative act exception applies, that exception is sufficient to lift the *Wagner* bar.

¶ 70. Here, the majority commits a grievous and fundamental error by failing to abide by the standards and principles underlying summary judgment. In so doing, it robs Tatera of the opportunity and right to present this case to a jury.

¶ 71. For the foregoing reasons, I respectfully dissent.

¶ 72. I am authorized to state that Chief Justice SHIRLEY A. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.